No. 23-1093. Council, you may proceed. Thank you. Good morning. I'm Ellen Richmond. I represent petitioner-appellant Defenders of Wildlife, and I'd like to reserve three minutes of my time for rebuttal today. I'm going to focus my remarks on two of the four issues that we briefed, two key deficiencies in this biological opinion, and a full analysis in this biop is really important. This biological opinion is coming at a key time for an entire lynx population, the only lynx remaining in the southern Rockies. This is a population that Forest Service researchers have said is in the emergency room. It's a population that Fish and Wildlife Service biologists have found is on a downward trajectory, and it's a population that depends heavily on a single national forest, the Rio Grande. So because the revised forest plan for that forest lessens protections against logging in lynx habitat, a full analysis of that change is really important. Turning now to the first of the two omissions that I mentioned at the outset, that's the failure to adequately analyze lynx usage of the northern portions of this forest. Three points to mention here. First, the agencies relied on the Squire study as the basis for their assessment of lynx usage of the forest. Second point, and this is undisputed, the Squire study did not cover the northern portions of this forest. It was limited to the southern portions. That's why, third point, there's no support in the record for the Fish and Wildlife Service's ultimate conclusion that it's okay to lessen protections for lynx habitat in the northern portions of the forest because those portions simply weren't covered in the Squire study. Now, I want to make really clear what Defenders of Wildlife is not arguing here. We are not arguing that Dr. Squires should redo his study. We're not asking any court to order any additional studies at all. We're simply arguing that some sound basis is required for assessing lynx usage of the northern portions of this forest, and the Squire study didn't cover those areas, so it can't supply that information. Well, counsel, I'm digging into the biop here, and it does say in the appendix of 230 that the study, the Squire study, the lynx occupancy in the northern LAUs is unlikely because the habitat conditions they prefer is lacking. Now, why doesn't that show that the biop considered whether the plan's designation of the northern part of the forest as low use would jeopardize the lynx based on habitat requirements found in the Squire study? I understand that the study didn't focus on, but it did identify habitat conditions that the biop in turn analyzed with respect to the northern portion. Right. I'm looking at page 230. It says based on Squires et al. 2020, we believe habitat is unlikely to provide sufficient high quality habitat. That statement simply can't be based on Squires et al. 2020 because Squires et al. 2020 didn't cover those high use areas. So that's a... That wasn't my question. I understand it didn't cover those specific areas, but it did analyze habitat conditions, and the biop talks about the habitat conditions in the northern portion. Why can't the agency do that? Why can't it extrapolate from the Squire study? The agency can't extrapolate from the Squire study because there simply wouldn't be any basis to extend the Squires discussion of habitat, and I agree Squires does discuss habitat, to habitat elsewhere in the forest. Well, why not? Don't you have to show that it would be arbitrary and unreasonable to do that? Why is it unreasonable to do that? It's unreasonable to do that because the agency simply doesn't know anything about the habitat in the northern parts of the forest. They couldn't have gotten that from the Squire study because the Squire study didn't... They know nothing about the habitat in that part of the forest. Nothing. Use the word nothing. Is that accurate? That's not what I'm arguing, your honor. I'm arguing that they can't know anything about the habitat in that part of the forest based on the You're combining the analysis in the Squire study with what they do know about the habitat. I agree that it would be appropriate for the agency to combine what they do know about the habitat with what they know from the Squire study, but the ESA requires that they use the best available science with respect to the northern areas, and there is a study that covers those and that's the Ivins study from 2012 that's in the fourth volume of the record. That's a scientific paper that found a high probability of lynx usage of the entire forest, not just the southern areas. So that study should have been considered along with the best available science from the southern portion of the forest. Wasn't Ivins a co-author of the Squire study? Doesn't that mean that Dr. Ivins accepted and endorsed what was in the Squire study? It does mean that Dr. Ivins accepted and endorsed what was in the Squire study. Wasn't the Squire study peer-reviewed and the scientific study and Ivins was not? Yes, all of that is true. And so how does that show that the Forest Service didn't rely on best available scientific evidence? Dr. Ivins, in being a co-author of the Squire study, wasn't asked to endorse how the U.S. Fish and Wildlife Service would extrapolate from the Squire study. Neither was Dr. Squires. No. But there were others who did. Didn't we have experts from the state and the agency itself? Yes, there's a reference in the revised biop to consultations with state and forest biologists that happened before the Squire study occurred. But the agencies haven't cited a single case where such an informal expert consultation with no disclosure of the basis or the underlying data or the techniques was used to support so important a policy decision as the exclusions of hundreds of thousands of acres of mapped lynx habitat from protections. The cases they've cited are cases in which data and underlying techniques were disclosed in the record. And I'm thinking here of the Aplomado Falcon case in which there had been surveys and Judge Kelly's opinion in the Colorado Wild case about categorical exclusions, I believe, in which the underlying data and techniques were all disclosed. This case is more like the Cougar animal protection case out of the District of New Mexico that we cited in which a conclusory and unsubstantiated personal comment from an expert was not accorded deference. And it only makes sense that that's the case. Expert intuitions, even from those who are well-versed in the facts, don't always prove out upon scientific study. And we saw that in the Squire study in this case in which the hypothesis that was initially tested ultimately was disproved when the study was finished. The ESA requires that the agency look at the best available science for the whole forest. And I would submit that that's the Ivan study for the northern areas and the Squire study for the I outlined at the outset, which is the failure of the agencies to analyze the population projections from the 2017 species status assessment. And that SSA found three key things. First, this Colorado population of lynx is on a downward trajectory. Second, the protections of the Southern Rockies Lynx Amendment, or SIRLA, are important to securing the future of the Colorado population. And finally, the Colorado population is important to the DPS, the lower 48 lynx population as a whole. The loss of any population unit, including Colorado, would be detrimental to the future of that DPS. Did the Fish and Wildlife Service draw that conclusion? The Fish and Wildlife Service drew that conclusion in 2017, but it wasn't discussed in the biological opinion. Well, did the Fish and Wildlife Service find that the lynx in the Rio Grande National Forest are particularly important to the overall DPS? Yes. Especially when there's six other Colorado forests, five other geographical units that are homes to the lynx, and only two percent of the lynx habitat is located there. So where did the Wildlife Service determine that they were particularly important to the overall DPS? And I understand the DPS to be the 48 states, is that correct? Yes, the lower 48. And the place that that finding is located is in the 2017 SSA. And I'd like to address the quotations from the six of the appendix, where some of those observations are included, and all the citations are in our brief. But what the service said in the SSA is, look, if you lose any one of these six population units, that would reduce the resiliency and thus impact the future of the lower 48 population as a whole. And that makes sense, given what the service said elsewhere in the SSA. Colorado has a lot of good snowy lynx habitat at high elevation. And some of those five other lynx populations are in places like Maine, where they have nowhere else to go upslope. So Colorado could prove an important elevational refuge, I believe is the term the SSA uses, in a warming world. And so that sort of provides the specifics for why Colorado is important. Now, I agree... Colorado or this, there's Colorado, but there's this forest, right? Did they specify this forest? They did not specify this forest, but the record says elsewhere that this forest contains the majority of the locations where lynx can consistently be found. The 85% of the lynx that were released in Colorado were released in this forest. So this forest really is the stronghold. And now I want to address Your Honor's point about the 2% of lynx habitat in the DPS. 2% is an observation about the quantity of lynx habitat in this forest, but it doesn't address the quality. This forest is supporting, or is at least providing primary support for an entire lynx population. A lynx population that the SSA found was important, and if it goes away, would impact the DPS overall. And those findings should have been considered in the 2021 BIOP. Unless there are further questions, I'd like to reserve the remainder of my time. Judge Kelly, do you have anything at this time? No, thank you. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Jacob Ecker for the Federal Agency at Belize. After a spruce beetle outbreak wiped out 100% of spruce fir overstory in the Rio Grande National Forest, the Forest Service updated its forest plan to be more protective of the Canada lynx in this new habitat. Based on best available science, it reasonably tailored its protections to the types of uses lynx make of the different areas of the forest. The issue in the case is whether the Fish and Wildlife Service rationally concluded that that would not cause or contribute to jeopardy of the lynx. This determination was based on reasoned scientific conclusions, an area this Court has said is entitled to greatest deference. The District Court upheld Fish and Wildlife's BIOP and this Court should affirm. So I'll take the two arguments that my friend on the other side addressed in the same order. Counsel, can you slow down a little bit? Thank you, Your Honor, of course. So defenders argue first that the Fish and Wildlife Service's conclusions about lynx usage throughout the forest was not adequately supported. And I would like to point the Court first to volume one of the appendix, page 226. There, the biological opinion makes clear that it is not only the Squire study, but it is also consultation with government biologists before initiating the field study that was the basis for the determination that the northern areas of the forest do not support high-quality lynx habitat. Well, do we have any idea who these people are? They're not identified in the biological opinion. Why isn't that a problem? I think, Your Honor, that what we have is a situation where Dr. Squires, and I'll just I don't know that there's a requirement that those biologists be identified by name. I think it's... Well, perhaps that there is a problem, though, when you're raising it as proof that it was considered. I mean, that's a very vague phrase that you just read. And that's what you're relying on proper consideration of the northern part, or just, I'm sorry, read it again. What are you relying on? Unnamed state officials. Let me be clear. So it's a combination of the Squire study itself, as Judge Matheson pointed out, with the consultation that preceded that study. So what the biological opinion explains is that before initiating the study, Squires, et al., consulted with state and forest level biologists to ensure that the designated study area captured all primary lynx use areas in the forest. So it's true that it was a premise of the Squire study, right? The study area was determined based on this consultation. But it's also true that that consultation was part of the basis for the determination that the northern areas of the forest don't support adequate or high quality lynx habitat. And there are multiple discussions throughout the biological opinion where it's explained that the northern portions of the forest simply don't have that same level of high quality habitat. And that is supported both by the statements in the biological opinion itself, along with the Theobald and Schenk study, which we discuss at page 32 through 34 of our brief. At pages 211 through 214 of volume four in that study, you can see two dark clusters. One is in the southern portion of the forest. The other is outside of the forest entirely. The northern portion of the forest is a connectivity area between those two zones. And the Forest Service reasonably protected that area as a connectivity area by applying all standard one, which is a standard that protects or requires that connectivity continue and not be disrupted by any future projects. So... Could I just... Please. I'm back on talks about Dr. Squires consulted with state and forest level biologists. And then a sentence or two later says, Dr. Squires and colleagues concluded that the northern portion of the RGNF supported too few Canada lynx to capture enough individuals to inform reliable modeling and mapping products. Was that all laid out and explained in the Squire study itself? What I just read to you? Was there an explanation as to the choice of the study area and what was included and what was excluded? In other words, where did this come from? Right. Well, it comes from the Fish and Wildlife Service, right? So it's actually the Fish and Wildlife Service's own statement of what was included and what was excluded from the Squire study. And so I think, Your Honor, it's, you know, the Squire study describes its methodology. I don't know that there's, you know, I don't think this is a quote from the Squire study, right? So I wouldn't, I absolutely wouldn't go that far. But I think a fundamental premise of the Squire study was that there simply, as this page, page 226 explains, there simply weren't enough links in the northern areas of the forest to collar and track. And so part of the reason for that is something that the Fish and the Wildlife Service says is that the northern areas of the forest simply don't support high-quality lynx habitat. But wasn't that also because of the beetle epidemic? No, Your Honor. No, Your Honor, I don't think that the beetle epidemic was a reason for the northern area of the forest not being high-quality habitat for lynx. There's statements in the biological opinion that indicate or explicitly say that it's the Fish and Wildlife Service's view that the northern portions of the forest have never supported lynx habitat in the same way that the southern portions of the forest have. You know, everybody, I think, agrees that the northern portions of the forest see some intermittent lynx use. And the Forest Service protected that use in the manner that it's used. It's a zone of connectivity between two areas where lynx actually breed, where they actually hunt, and that's directly linked to the high-quality habitat for their primary prey, which is the snowshoe hare. The southern portions of the forest are higher altitude, they have thicker snow cover, and the snowshoe hare is more common there. And that's the basis for the conclusion that the northern areas of the forest simply don't support the same level of habitat. Did the earlier Ivan study undercut the BiOPS consideration of the northern low-use designation? So two points there, Your Honor. First, I'm not sure that the Ivan study is all that inconsistent. I mean, I think what the Ivan study shows is that there are attributes of the northern areas of the forest that lynx might use, but it's based on older data, older satellite data, that the Fish and Wildlife Service reasonably determined shouldn't be credited in light of much more recent science, right? What we have now is a panel of experts, state and federal biologists, who have said, we don't see... The identities of whom we don't know. That's correct, Your Honor. On the record, we don't have the identities of those individuals, but I think the important point is the second point I was going to make here, which is that in the situation where, let's say the studies do conflict, right? Let's say Ivan and the Squire study conflict, this court is obligated to defer to Fish and Wildlife's choice between those conflicting studies. That's New Mexico Farm and Livestock, cited at page 35 of our brief. And if I may also point out that I think Colorado Wild is sort of an on-point case here for this issue. We do have what I would qualify as sort of somewhat less than formal consultations here, but there's really nothing legally wrong with relying on a panel of experts as part of the second issue that my friend on the other side raised. Was there a panel? I don't remember seeing a panel. I don't know that they use the word panel, Your Honor. I think it's state and federal biologists. So I wouldn't say they formally impaneled anyone. So I use that as a shorthand, and if that's unclear, what I mean is they consulted with state and federal level biologists. Is this common in the biop world to have this kind of reference to internal communications and analysis and basically what we have here? It does happen, Your Honor, and I think it's most common in situations like this where it's a premise that I think everyone goes in agreeing on, which is that the northern areas of the common sense haven't supported lynx habitat that is of high quality and will not in the future, and it's unlikely to continue. It's interesting because I think some of these statements were added as clarification in the amended, in the revised biological opinion, essentially because everybody went in with this understanding that this is how the forest and the lynx operate within the forest, that the northern areas of the forest are connectivity habitats, the southern areas are high use habitats where they actually live. You know, that reminds me of another question I wanted to ask you. So the revised forest plan issued in 2020, defenders in September 2020 noticed an intent to sue, and then there was a 2021 revised biop. That's right, Your Honor. Was that in response to the notice of intent to sue? It was, Your Honor, and I think the supplement that we submitted makes this clear. I think it's on page four of the supplemental appendix, which there's only one volume of. It actually explains that the biop was revised to provide clarification on this very issue. I take it there's no dispute between the parties that we're looking at the 2021? No, no, Your Honor. The revised biological opinion is what's before the court. All right. So I'd like to turn, if I may, to the species status assessment. I'd like to first point the court to page 240 of volume six. That is where the species status assessment says, and Judge Matheson, you had some questions about, you know, whether this was an area of particular or special importance. What the species status assessment says about Colorado is that it has provided, at least temporarily, it has provided additional redundancy. We don't have this finding that it's of some particular or special importance. I think what's equally important here is that the revised biological opinion specifically deals with this issue. At page 223 of volume one, it says, we continue to believe that available information suggests Colorado lynx, excuse me, that Colorado did not historically support a persistent resident lynx population, and the long-term persistence remains uncertain. That's page 223 at volume one. And after it finishes that sentence, it then cites the 2017 species status assessment. So I think any argument that it wasn't addressed or dealt with is incorrect. Now, I don't think that the biological opinion has to go into the same level of detail as the earlier 230-page species status assessment. This document is prepared for a different purpose, and the discussion here is sufficient to that purpose, which is determine whether the more protective plan will cause or increase jeopardy to the Canada lynx. So unless the court has any questions, I'd be happy to rest on the brief on the two other issues, since neither party has addressed those two issues today. If the court would like, I can run through those. Well, I think I'd be interested in you kind of returning to this northern area again and just sum up what is the core argument you're making about that. So I would say there are two points, Your Honor. The first is that it was a premise of the Squire study, as the revised biological opinion relates, that the northern area of the forest does not provide sufficient habitat. That's why the Squire study was not able to trap lynx there, to collar them and track them. It was a premise going into that study. Now, that is supported both by the consultations that we've been talking about and also by the Theobald and Schenk study discussed at pages 32 through 34 of our brief. That's point one. Point two is, based on this reasoned discussion and analysis, it is the fish and wildlife's discretion between conflicting studies, to the extent there is a conflict between Theobald and Schenk, the consultation, and Squires with Ivan. It is fish and wildlife's job to judge that science in the first instance and to determine what it's going to credit and what it's not. That's New Mexico Farm and Livestock Bureau. Counsel, so can I just rephrase your argument? You're saying that the Squire study assumed that it wasn't worth looking in the north and therefore the Squire study does not consider the north. It just, I mean, it doesn't consider it for a good reason. Are you not making an argument that we can extrapolate from Squires about the north? You're not making that argument. I think that the study area in the Squire study did not include the north. So to directly answer your question, no, we're not making that argument exactly. What I would say is I would quibble with like assumed in this context. It is based on pretty solid science as we've discussed in the brief. Okay, it rationally assumed, I guess. That's our point, right? And it's an APA review case, so arbitrary and capricious is the standard. Okay, thank you. Thank you, Counsel. I think there's some rebuttal time. I'd like to address the northern areas first. Counsel has said that the agencies are resting, as I understand it, entirely on the consultation that occurred as a premise for the Squire study, as the basis for assessing LINC's use of the northern areas. The other study that was referenced, the Theobald and Schenck study, that is not cited in the biop for the conclusions that Counsel is drawing from it. And this court shouldn't be put in the position of interpreting the maps from the Theobald and Schenck study. I'd also like to call to your attention that Dr. Ivan's study says explicitly we are extending the work of Theobald and Schenck from 2011. Ivan remains the best available science on this issue. The statements that Counsel made about higher altitude and thicker snow in the southern parts of the forest, that is not in the record that's being presented here today. Their argument boils down to trust us, defer to us, and when there's no basis for that deference in the record, that's antithetical to the concept of record review. And I'd note that the New Mexico farm and livestock case that Counsel referred to, that case actually held that the critical habitat designation at issue was arbitrary and capricious. In terms of the SSA, those statements from the biop on page 223 of the first volume that Counsel was referring to about how the future of LINC's is uncertain, that is not a reference to those three key findings of the SSA that I outlined in my remarks, and here's why. Uncertain is not the same as a downward trajectory, and which habitat historically supported LINC's doesn't have any bearing on the future outlook for LINC's, which is the focus of the Jeopardy analysis. So for those reasons and the others that we've gone through in our briefs, this biop is arbitrary and capricious, violates the SSA and APA. Thank you very much. Thank you Counsel. Thanks to both of you for the arguments this morning. The case will be submitted. Counsel are excused.